Hall, Judge.
The bill is brought by F. W. Marshall, who sues for and in behalf of himself and the concerns of the Unitas Fratrum in this state. To this bill there is a demurrer, in which one cause of demurrer set forth is, that the bill does not shew what persons those are that (besides the said F. W. Marshall) have brought this suit.
At the same time that the demurrer was argued, a motion was made by the complainant's counsel for leave to amend the bill, in case it should be thought by the court that the cause of demurrer before stated was a good one. I will first consider whether it will be proper to grant *239 leave to amend the bill—Wherever the court has power to permit an amendment to be made, it is better to exercise it than to suffer a suit to go off, upon an objection to form, or indeed any objection in which the merits of the cause are not involved. A plaintiff may amend his bill upon payment of costs of the demurrer—Wyatt’s Register in Ch. 68.—After argument of a demurrer to whole bill, and the demurrer held good, it is not usual to allow an amendment, because the bill is regularly out of court. But, from this rule of practice, it seems there are some exceptions—one is, in case of a demurrer for want of parties; in this case an amendment has been permitted to be made, although upon argument the demurrer has been held good—2 Ch. Ca. 197---2 P. W. 300---Wyatts Register in Ch. 164.
This case has been set for hearing upon bill and demurrer—it has been argued; but as yet the court have given no opinion. I feel myself authorized, at this stage of the proceedings, to allow the bill to be amended, upon the complainant’s paying the costs of the bill, and one fee for counsel. The leave given to amend the bill, arises from a conviction that this part of the demurrer would prove fatal to the bill, in case it was to rest on that issue alone. Although it may not be necessary to give the reasons on which that conviction is founded, I will do it in a concise manner, as all the court have not the same impressions with respect to the demurrer. Here two questions arise: 1st. Was it necessary that the names of all or any of the individuals composing the U. F. should have been mentioned by name in the bill? It is regularly true, that *240 all persons interested should be made parties by name; because although a decree may be made if that is not the case, yet none but parties, and those claiming under them, are bound by it—1 Harrison's Cha. 32. 6 Ed.—This is a good general rule, and like most others stands proved by its exceptions. Those exceptions are founded on necessity, and the impracticability of obtaining justice in many cases by a strict adherence to that rule, where there are a great many persons all interested in the same way. If it was indispensably necessary to make them all parties by name, there would, in all probability, be so many abatements by death, &c. that it would be extremely difficult ever to come to a final determination—2 Eq. Ca. Ab. 167.— It is said by Lord Ch. Hardwicke, in the Mayor of York vs. Pilkington and others, 1 Atk. 282, “that a bill “may be brought against tenants by a lord of a “manor for encroachment, &c. or by tenants “against a lord of a manor as a disturber, to be “quieted, &c. And as in these cases there is “one general right to be established against all, it “is a proper bill—nor is it necessary all the com-“moners should be parties. So likewise a bill “may be brought by a person for tithes against “the parishioners, or by parishioners to establish “a modus, for there is a general right and privity “between them, and consequently it is right to “institute a suit of this kind.”
The case in 2 Browne's Rep. 338, was a case where it was thought practicable that all the parties, to wit, the part owners of the ship, might be named in the bill; and whenever that is the case, it is proper to name them: But whenever it is not practicable, with a view to settle the *241 rights in question, it is unnecessary to make all the individuals parties by name—and with this principle I think common reason, and the authorities I have seen on the subject, accord. I therefore think that in the case now before us, where the individuals composing the U. F. are so numerous, that, to require that each individual should be named as a complainant, would so much embarrass the future progress of the suit, and subject it to so many unavoidable delays, as to amount nearly to a denial of justice; and of course that such a requisition ought not to be made. Although for the reasons before stated, I do not think in some cases that all persons should be made parties by name, yet I think some of them ought; and that in the present case some of the individuals composing the U. F. should have been mentioned as complainants. The inconvenience of making all of them parties by name, does not hold good against the requisition that some of them should be made parties by name; and in proportion as the reason fails, on which the exception before stated is founded, so in proportion ought the rule that all persons interested should be made parties by name, be adhered to. A bill may be brought by a few creditors on behalf of themselves and the rest; the names of all of them need not be mentioned, but the names of some of them must. If the names of some of them are not mentioned, it is certainly a good cause of demurrer; and there can be no aid decreed from the circumstances that the name of their agent is mentioned in the bill who sues on their behalf. A bill cannot be brought by an agent in his own name, it must be brought in the name of his principal—2 Vesey 313.—I therefore think that the names *242 of some of the individuals composing the U. F. ought to have been expressed.
2d. What interest does it appear from the bill F. W. Marshall has in the property in dispute? Or in other words, is it to be collected from the bill that he is one of the U. F ? The bill expresses that the suit is brought by F. W. Marshall, on behalf of himself and the concerns of the U. F. in this state. From this expression it appears, that whatever his interest may be, it is distinct from that of the U. F. If he was one of the U. F. and sues in that character, it certainly is not so expressed—it is stated not only that he sues on behalf of the interest of the U. F. which interest, to wit, the interest of the U. F. comprehends his own, if he sues as one of them; but further expresses, that he sues on behalf of himself. Now if he sues on behalf of himself, as one of the U. F. the expression means nothing more than is to be collected from the one immediately preceding it, where he says he sues on behalf of the interest of the U. F. Suppose it was asked and ascertained what his interest was, would that satisfy a desire to know what the interest of the U. F. was? Or suppose it to be known what the interest of the U. F. was, could that be relied upon as a certain knowledge of what the interest of F. W. Marshall was?
It appears from other parts of the bill, that F. C. Cossart, after the descent of the lands in question to him, executed a power of attorney in the year 1772, to F. W. Marshall, empowering him to sell, &c. said lands, and also authorising him to constitute other attornies—That in 1774, F. W. Marshall executed a power of attorney *243 to John Michael Graff, who sold said lands to Hugh Montgomery—That Hugh Montgomery, by deed, &c. demised the said premises to the said John M. Graff, for and during the term of 500 years, with a proviso, &c. that the same should be void upon payment of the purchase money—That the said John M. Graff afterwards died—That Tauggott Bagge became his administrator—That he assigned the said term to F. W. Marshall, then and now the agent and trustee of the said U. F.-It is again expressed, that by the appointment of the said U. F. the said F. W. Marshall hath been duly authorised to bring suits—that the U. F. are bound by all judgments rendered in such suits.—Thus it appears what interest F. W. Marshall really has. In the first place, he is agent for selling the lands; in the next, for instituting suits. If he brings this bill as agent, &c. for the U. F. but not in their names, or the names of any of them, we have already seen that the suit is not well brought, it did not follow, that because he was an agent for the U. F. that he was one of them, because that agency might as legally have been intrusted to a person that was not, as to a person that was of the U. F. If he sues as assignee of the term of 500 years, that is an interest distinct from that claimed by the U. F. In another part of the bill it is stated that he has the fee; if so, the U. F. has it not, so that that is an interest distinct from theirs. He may act as agent, &c. be possessed of the term, &c. or have the fee, &c. and still not be one of the U. F. If he is one of them, those interests are distinct from that claimed by them. I conclude that it does not appear from the bill that F. W. Marshall was one of the U. F. and that had leave not been given to amend *244 the bill, this part of the demurrer must have proved fatal to it. The first cause of demurrer goes on to state that the bill does not set forth what interest they (the individuals composing the U. F.) respectively have; nor indeed that they have any interest at all, in law or equity, to the lands sued for. The bill expressly states that the lands in question were conveyed and granted to Henry Cossart in trust, &c. and there-forward held the said land as trustee for the said U. F. and no otherwise. The facts stated in the bill must, at this stage of the proceedings, be received and taken as true: if so, what interest the U. F. has, clearly appears from the bill.
With respect to the second cause of demurrer, this is not a dispute between the lenders of the money and the complainants. How could the complainants comply on their part, viewing the interest of the lenders of the money in the light in which the demurrer places it, unless they had the fee, either to make payment with, if the lenders of the money came over, or to sell by him who had the fee. The bill does not statthat the land was held in trust for the lenders of the money—a recovery in the present instance cannot prejudice any right which the lenders of the money may have. The U. F. whether incorporated or not, appear to have been recognized by the legislature of this state in the year 1782, as having an existence, and capable of having lands held in trust for them—Martin’s collection of private acts, 105.—The preamble of this act states, that “Whereas F. W. Marshall “hath made it appear to this General Assembly, “that all the tracts of land within this state be “longing to the lord advocate, the chancellor, *245 “and the agent of the U. F. or United Bre-“thren, have been transferred to him from the “former possessors in trust for the U. F." And the act then goes on, and after declaring some deeds to be valid, and directing them to be admitted to probate, vests certain lands in F. W. Marshall in trust, as aforesaid.
As to the 3d and 4th causes of demurrer, it appears from the bill that the lands in dispute were conveyed to Henry Cossart, as agent, &c. in the year 1754, and that no adverse claim has been set up, until that on which the defendants now rely, or that from which they attempt to derive title. That C. F. Cossart, to whom the lands descended, was, at the time of the declaration of independence, and ever afterwards, a subject of the King of Great-Britain. I suppose it cannot be contended, but that these lands were legally held by the Cossarts until the declaration of American independence. Immediately after this declaration, the state of North Carolina, like the other states in the Union, became a fovereign and independent state, and chose for herself her present form of government. In the 25th section of the Bill of Rights it is expressed, “that “the property of the soil in a free government, “being one of the essential rights of the government, “body of the people;” it is necessary, in order to avoid future disputes, that the limits of the state should be ascertained. After ascertaining the limits, &c. it is further expressed, that “all “territories, feas, &c. therein, are the right and “property of the people of this state, to be held “by them in sovereignty." In the third proviso of the same section, it is further expressed, “that “nothing herein contained shall affect the titles *246 “or possessions of individuals holding or claiming "under the laws heretofore in force, or grants "heretofore made by the late King George III “&c. or late lord proprietors; or any of “them.” Thus, the people of this state assert their claim to the territory, &c. included in its boundaries, but without prejudice to titles of possessions held &c. as in the said proviso set forth. Next come the act of confiscation, designating what persons are of citizens; and for the seasons set forth in their preambles, confiscate the property of people of certain descriptions. Amongst persons of the description whose property was confiscated, was C.F. Cossart, the person who it is stated in the bill held their offices in trust for the U. F.-It has been argued for the defendants, that inasmuch as the heritable blood of the said Cossart became extinct, and he and his heirs could no longer hold the lands, that the state took them by escheat, not subject to the trust of the U. F. and that the state had a right to grant them to the defendants, not subject to the trust; and the doctrine of escheats are land is relied upon. In England escheats are divided into those, proster defectum sanguinis, and those proper delictum tenentis. The one fort, if the tenant dies without heirs-the other, if his blood be attainted-2 Bl. Com 245.-It cannot be pretended that the lands in question escheat to the state as coming within the latter description, propter delictum tenentis, because although a nation has a right to change its form of government, yet any individuals of that nation are under no obligation to submit to such change; they have a right to retire elsewhere, sell their land, &c. and take with them all their effects— Vattell, b. 1, ch. 3, pa. 30.—In conformity to *247 this principle, the legislature of this state gave leave to such person as were ordered out of the state, to fell and dispose of their estates, &c.— Iredell 286.—It could not then be said that persons who did not with to submit to the form of government of this state, and withdraw their allegiance from the King of England, were guilty of any crime. The other sort of escheat is where the tenant dies without heirs. Is that the cafe in the present instance? Does it appear that C. F. Cossart died without heirs? It does not. The fact appears to be, that he did not die without heirs; but that he became incapacitated to hold lands in this country, some time after these land descended upon him, because he continued to be a subject of the king of Great-Britain. This case has no parallel that I am aware of in the English books. Lord Keeper Henley says, in Burges vs. Wheate, 1 Bl. Rep. 178, that if lands do efcheat, not subject to a trust, he supposes it no injury or absurdity at all, volenti non fit injuria. The creator of the trust determines to take the conveniencies of the trust with its inconveniencies, when this trust estate was created. What was the security of the U. F. against a lots of it by an efcheat of the legal estate? That the trustee would not die without heirs—that he would commit no offence in consequence of which his blood should be attainted. It is true, if the trustee conveys the legal estate for a valua ble consideration to a purchaser without notice, the trust estate may thereby be destroyed; but this depends upon other and quite different principles. At the time this trust estate was created, it was not contemplated that any acts of confiscation would form the medium of escheat, and thereby operate a loss of the trust estate to the *248 owners thereof, against whom it is not pretended the confiscation laws were ever intended to operate. Suppose that before the revolution, either in England or in this country, a law had passed, declaring that persons of any particular description should no longer hold lands in this country: if the lords proprietors had seized upon lands thus situated, I think they would have taken it with its incumbrances. It is not that I imagine that the state has a right to take a greater interest, or a larger estate, than the lords proprietors could have done. With what intent did the legislature of North-Carolina pass the acts of confiscation? and what was the mischief which existed at that time? and what was the remedy intended to be applied? For such a construction ought to be put upon a statute, as may best answer the intent which the makers of it had in view—4 Ba. Ab. 647.—And that intent is sometimes to be discovered from the cause or necessity of making an act of parliament, &c. and sometimes from foreign circumstances: when this can be discovered, it must be followed with reason and discretion in the construction of an act, although against the letter of it—Idem 648.—The motives by which the legislature were actuated in passing these laws, is set forth in the preamble of one of them—Iredell 341—that “whereas divers persons, who have heretofore "owned and possessed lands, &c. in this state, “have withdrawn themselves from the same, and "attached themselves to the enemies of the Uni"ted States of America, &c. and also divers “persons having been beyond the bounds of the "United States at the beginning of the present "war, have failed to return and unite their ef"forts for the common defence of American li"berty; and it is expedient and just that every *249 "person for whom property is protected in any “state, should join in defence thereof, whenever “the same is threatened or invaded.” Time is then given to persons whole situations are described as above, alledging favourable circumstances, to become citizens, &c. otherwise their property is to be confiscated. Thus we at once see their intent in passing the law, the mischief Which prevailed, and the remedy intended to be applied. I see no reason for believing that the legislature intended that the acts of confiscation should operate upon persons of any description, except those described in the preamble of the act. Their object was to hold out inducements to them to remain with us, by darkening and rendering as gloomy as possible their prospect, in case they left us, and fought to attach themselves to the enemies of our country. The avowed object of these acts was to increase the security which the citizens of the state had to their rights; by no means to impair it. C. F. Cossart was one of those persons described in the confiscation laws: his property was confiscated, it was said, and of course the legal title to the land in question; be it so. Was it the object of the legislature to confiscate any rights, &c. but those of which he was possessed? If not, the operation of the acts of confiscation is commensurate to the causes which gave birth to them, and the remedy rationally proportionate and equal to the mischief. If, however, their operation is extended further, and made to include the rights of our own citizens, persons not described in the preamble I have just recited, but persons for whose benefit, in common with other citizens, the confiscation laws were passed, such extention of their operation can have no corresponding cause in *250 that preamble, nor can be reconcilable with any motive that actuated the legislature upon that occasion. Their object certainly was to secure not to destroy the rights their own citizens. Let us suppose it a doubtful case, and suppose also that the legislature were present, and the question put to them, did you intend to injure the rights of your own citizens by passing the confiscation laws? Let such an answer be given as it may be supposed they, being upright and reasonable men, would give—4 Bac. 649.—No person can imagine that the legislature would say that, without any cause they intended to sacrifice their fellow citizens; for I can venture to believe, that if such a sacrifice was to be made, it would be without cause. Suppose all the persons whose names have been mentioned, or whose property has been confiscated, in and by the confiscation laws, to have been naked trustees without any beneficial interest, could the legislature have though that those trustees would be affected one way or the other by the confiscation laws? The beneficial interest, in the present instance, is in our own citizens, nothing but a naked and unprofitable title was in C. F. Cossart. The legislature, in all probability, knowing this, have not thought proper to make mention of his name in any of the acts of confiscation. I suppose the fact to be, that all the persons who are mentioned by name in the confiscation act of 1779. Iredell 379 not only had the legal estate in them, but had also the beneficial interest attached to it; at least that the legislature supposed that to be the fact, by a general expresion-the act then includes "all-others who come within the meaning of the confiscation and this act, &c."The act certainly intended to operate only upon the interests of those *251 who deserted the American cause, and attached themselves to our enemies. It never intended, by confiscating the legal estate, a things of no moment to Cossart, to deprive our own citizens of the trust estate. If compensation is to be made to the state by C. F. Cossart, because he attached himself to the enemies of our country, why involve in that compensation the rights of some of the citizens of the state, to whom in part that compensation is to be made? If this argument stands in need of any support, it may be derived from the proviso in the bill of rights before spoken of-the section of which this proviso is a part, declares that all the territory, &c. of the state, is the right and property of the people of this state. The state, however, did not think proper to interfere with, or affect the titles or possessions which any of her citizens held on claimed under the laws before that time in user or grants before that time issued. The possessions of the lands in question by the U. F. or by persons claiming under them, which is the same thing, was a possession guarded by the proviso, as having been obtained in consequence of the issuing of a grant before that time, under the then existing laws of the country. Although affairs, in North-Carolina, as well as in the whole Union, had assumed a new aspect, the right of individuals, before that acquired, were not forgotten. The same spirit of protection, which to strongly manifests itself in this section of our bill of rights, I am of opinion had not taken its leave of our legislators when they passed the acts of confiscation. The 3d section of the act of 1782, before spoken of, Martin’s collection of private acts, 105, declares, that the power of attorney of. C. F. Cossart, dated 3d of November, 1772, empowering *252 said F. W. Marshall to sell his lands, be admitted to probate, &c. registry in the county of Wilkes, and be as good and valid in law, as, it could or might have been, had the act of confiscation never been passed. The intent of the legislature, as far as it is discoverable in this act, was not to destroy, but to secure the rights of the complainants to the lands in question. Did they intend to amuse them by laying, that the power of attorney should be valid, &c. and at the same time deprive them of that in support of which they declared it should be valid? For my own part, I attribute to them no such duplicity. It is said in Vattell, book 3d, ch. 13, p. 575, that formerly in conquests even individuals lost their lands, &c. but at present war is less terrible to the subject; things are transacted with more humanity; it is against one fovereign that another makes war, and not against quiet subjects. The conqueror lays his hands on the possessions of the state, &c. while private persons are permitted to retain theirs—they suffer but indirectly by war, and to them the result is, that they only change masters. If an adherence to this principle would have afforded protection and security to the rights of our citizens, in case a conquest had been made of our state by some other or third nation, how much more strongly ought the principle to be adhered to, when the people of which the complainants are a part, became masters of it, and possessed the fovereign power. It may be said, that the faith of the state is in some measure pledged to support the titles of the defendants. Was the state consulted in one stage of the proceedings which the defendants have thought proper to adopt in procuring a title? If it was, I am a stranger to the fact. If they *253 thought proper to enter these lands, and obtain grants for them, knowing at the same time of the claim set up by the complainants, they must abide by the consequence—the act was their own. The fifth cause of demurrer has not been argued, and I suppose is not relied upon by the defendants. I think the whole demurrer should be over-ruled, except that part of it as to which leave has been given to amend.
Johnston, Judge.—
The complainant sues in behalf of himself and the concerns of the Unitas Fratrum in this state.—It is set forth, that
The U. F. are acknowledged as an ancient Protectant Episcopal Church :—
Have no joint stock or funds :—
Have negociated loans by their agents, for the purpose of making new establishments or settlements, and in particular for the purchase and settlement of Wachovia—The lenders had their option either to come to this country, and receive lands to the value of their respective loans, or remain in Europe, and be reimbursed from the sale of the lands:—
That the lands of the U. F. were conveyed to complainant, by deed of lease and release, by their secretary, James Hatton; and that he was afterwards authorised to sell, and transact the business of the U. F. by act of the General Assembly, which confirmed the deeds so made:—
That he is empowered by the U. F. to institute suits, &c.—
*254 That Henry Cossart, known agent of the U.F. and admitted such by act of parliament, obtained two grants of land from Earl Granville to him, as agent for the U. F. the one for 3840 acres, more or less; the second for 4933 acres, more or less, both in Wilkes county—that these lands were granted and conveyed in trust, and that the grantee held the same in trust as a trustee for the U. F.—
That before the 4th of July, 1776, Henry Cossart died, leaving Christian Frederick Cossart, residing in the kingdom of Ireland, his heir at law, who continued to reside in that kingdom, and never came to America, and was never admitted a citizen of this or any of the United States:—
That Ch. Frederick Cossart, in the year 1772, after the death of his father, the original grantee, executed a letter of attorney empowering the complainant to sell the said lands, with power of substitution; in pursuance of which he, on the 4th of October, 1774, substituted John Michael Graff, to execute the said power in his stead :—
That John Michael Graff, in pursuance of the said substitution, on the 23d of July, 1778, sold to Hugh Montgomery, for a valuable consideration, and conveyed as well the legal estate, which was supposed to be vested in Cossart, as the equitable interest of the U. F. in the said lands :—
That Graff received £. 1000 in part of the purchase money; and to secure the payment of the balance, £.1500, took a lease of the whole lands for 500 years, to be void on the payment of that balance with interest:—
*255 That Graff soon after died intestate, and administration of his estate was committed to Trauggott Bagge, who, in Dec. 1784, assigned the lease to the complainant in trust for the U. F.—
That in the year 1778, Hugh Montgomery entered upon and took possession of the premises, and that his trustee and executors have from that time continued in possession of some part of it, but never have paid up any part of the balance of £. 1500, or the interest:—
That the General Assembly have validated and confirmed the power of attorney, under which the lands were sold to Montgomery.
Demurrer 1st, That U. F. are not parties, &c.
It appears by the bill, that the complainant, W. F. Marshall, holds in trust for the U. F.—it is therefore necessary, in order to entitle the complainant to a decree, that the Ces lui que trust, whoever they may be, should be made parties; though it is said it is not always necessary to make the trustee a party—Kirk vs. Clark, Cha. prec. 275.—Vin. Abr. Title Party, p. 250, sol. ed.— It is said that the U. F. are known and acknowledged a religious society, by act of Parliament before the revolution, and recognized as such by our acts of Assembly since, which have confirmed their titles to certain tracts of land within, this state; that they are very numerous, and it would be extremely inconvenient, if not altogether impracticable, to set forth the individual name of every member of the society—yet certain individuals by name might sue, in behalf of themselves and the rest of the society, in conjunc *256 tion with the trustee; as in the case of the treasurer and managers of the Temple Brass-Work Company—2 Cases in Equity Abridged, 168.
2d. Though it appears plainly, from the facts set forth in the bill, that the U. F. have an interest in the lands, they are not in court to claim it. It is true, F. W. Marshall says he is empowered to prosecute suits for them; but he is only their agent or attorney, and cannot maintain a suit in his own name. It does not appear to me that it is necessary to make the money lenders parties, other than such as came over to this country, and received lands in satisfaction for their loans. The presumption, however, as was well observed by one of the counsel for the complainants, is, that after so great a length of time the money has been paid, or the lenders satisfied in some other way ; if not, they may have their remedy against the borrowers, but have no lien on the lands, as it appears the money was intended for other purposes as well as to purchase lands, and none of them have any claim on the lands, except such of them as may come to this country with a view to settle on them. Therefore it was not necessary to make the lenders of the money parties, or any of the U. F. but such as are acknowledged citizens of this state, who alone have any pretence to claim an interest in it.
3d. It was not necessary that Cossart should enter—he had no right to the possession, having only a naked trust, for the use and benefit of the U. F. who were the only persons who had the sole right of occupation and possession, under the stat. of 27th Hen. VIII.
*257 4th. It appears that the lands in question were granted by Earl Granville to Henry Cossart, in trust, for the use of the U. F. and for no other use or purpose whatsoever; that he died some time in the year , and that the trust descended to his son, C. F. Cossart, who, before the declaration of independence, executed a letter of attorney to W. F. Marshall to sell and dispose of the lands, who substituted J. M, Graff for that purpose, and who, in the year after the declaration of rights, sold, &c.—It is therefore contended that C. F, Cossart, at the time of forming the constitution and bill of rights, being an alien, his estate devolved on the people of the state, in their collective capacity, who lock the estate discharged of the trust.
It would be useless to look into books for a case in every respect similar to the one now in question. The case which comes nearest to it, is where the trustee died, leaving an alien his heir at law : in that case it is contended the lands would escheat to the lord, discharged of the trust. And there are some cases to warrant this opinion, though the case of Eales and England, reported in Precedents in Chancery, states the law to be otherwise, that the lord would hold as trustee for the benefit of the Ces lui que trust.
All the cases that are to be met with in the, books, however, differ from this, that the trust were created, and conveyed by a tenant who held under a superior lord, who was entitled to the escheat free from any trust, to the use of the grantee only. In this case Earl Granville, who was entitled to the escheat, created the trust himself, and granted the estate in trust to the first grantee.
*258 Therefore if the grantee had died, leaving an alien his heir, and for that cause the estate had escheated to Earl Granville, I am clearly of opinion that he would have taken it charged with the trust, as he could not, on any principle either of law or equity, be allowed to avoid his own deed, so as to destroy a trust created by himself bona fide, and for a valuable consideration.
It is next to be considered in what manner this trust was effected, by the revolution and change of government by which Earl Granville’s interest in his estate in this country became vested in the collective body of the people, when they assumed the sovereignty of the state. By the 25th section of the Declaration of Rights, after describing the limits of the state, it is declared, that all the territories within those limits " are the right and property of the people of this state, to be held by them in sovereignty.” 1st proviso, saving to the Indians their rights to hunting grounds—2d proviso, reserving a right to establish one or more governments to the westward—3d proviso, " That nothing herein contained shall affect the “ titles or possessions of individuals holding or “ claiming under the laws heretofore in force, “ or grants heretofore made by the late King “ George III, or his predecessors, or the late “ lords proprietors, or any of them.” This proviso should on all occasions receive a liberal construction in favour of the rights of individuals, to guard them against the encroachments of the public functionaries then established, and who by this instrument were vested with certain limited powers, from which the titles and possessions of individuals are expressly excepted. This, Congress which represented all the free inhabitants *259 of this state, cloathed with all their authority, and invested with all their rights, restrained by no law, unawed by any authority, in the plenitude of their power, have drawn a line between the proper rights in landed property of the individual citizen, and those of the collective body of the people. All titles or possessions, held or claimed under former laws, or grants, either royal or proprietory, are secured and confirmed to the individual, so that he cannot be divested of them, but on a trial in due course of law. And this is a fundamental principle, which cannot be departed from, by any power existing under the constitution, without a direct and manifest violatation of that sacred compact, to which it is the duty of every citizen to adhere and defend from every attack, however respectable the authority may be from whence it may originate.
It has been contended by the counsel for the complainant, that by this proviso the right of C. F. Cossart is saved; but this position cannot be supported from a rational or grammatical construction of that clause. The declaratory part, in the first instance, vests the whole in the collective body of the people: the proviso then reserves certain rights to individuals, which can only mean individuals of the collective body of the people of this state, or of the people who were then represented in that Congress. C. F. Cossart never was one of the people of this state, nor was he one of the people represented in that Congress; he therefore cannot avail himself of any benefit or advantage from the saving in that proviso. But though it does not extend to the confirmation of Cossart’s right, yet it fully comprehends the rights of the U. F. who were then inhabitants *260 of the state, and individuals of the collective body of the people, who held a rightful possession, under a bona fide purchase, for a valuable consideration, and a grant from one of the late lord proprietors; not only an actual but a legal possession, under the act of the 27th H. VIII. ch. 10, for transferring uses into possession, which, vests the possession in him or them that have the use. Thus the possession of these lands are irrevocably vested in the U. F. by the Constitution.
It has been said by the counsel for the defendants, that the acts of Assembly, commonly called the confiscation laws, have vested the use of all lands held by persons who were not resident in this state, or some one of the United States, at the time of the declaration of independence, and have not since been admitted as citizens of the state. Should that be the case, it can have no effect on the interest of the U. F. which is secured to them by the Constitution, which must be admitted to be paramount to an act of the legislature, which is itself a creature of the Constitution. These acts however, in other respects, may well stand without interfering with the Constitution; but when duly considered will be found to vest no right to the lands of aliens in the state, other than it had under the Constitution. The confiscation acts had in view three other objects, on all of which they might operate with propriety;—1st. To direct in what manner the estates of aliens should be sold and disposed of.—2d. To confiscate and forfeit the lands of traitors, and of such citizens of this state, or of any of the United States, who had gone over to the enemy, on conviction.—3d. To re *261 store to aliens their estates, on their taking the oaths to government, and becoming citizens.
The lands of aliens being already vested in the state, any further act could add nothing to the validity of the right of the state; but it was necessary to point out the mode of disposing and conveying these lands. In every other respect these acts, so far as they relate to aliens, operate as acts of grace and favour, holding forth to them the generous offer of restoring their estate on their becoming citizens : And when the legislature discovered so plainly a disposition to be not only just but generous, in regard to aliens, it ought not to be presumed that they meant to deprive their own citizens of rights, which they held under the solemn sanction of the Constitution.—As the land was secured to the U. F. by the Constitution, if I am right in my position, it is unnecessary to say any thing of the inquest of office relied on by the counsel.
In regard to the conveyance made to Montgomery, it is evident that Cossart, at the time of making the conveyance by his attorney, had no interest in the estate, and of course his attorney could convey nothing. But it is charged in the complainant’s bill that this defect is remedied by an act of the General Assembly; so far, however, as that conveyance affects the interest of the U. F. if made by their consent, and under their authority, it is sufficient to convey their interest, and to vest the use and possession of the premises in the purchaser, his heirs and assigns; and they in return are bound to fulfil their engagements with the U. F.—Thus far I have considered the estate or interest which the collective body of *262 the citizens of this state acquired in the lands heretofore vested in the King of Great-Britain and his subjects, in the same light in which it was stated by counsel on both fides, namely, that it was acquired by escheat. But it appears to me, on such consideration as I have been able to bestow on the subject, after looking into such authorities, both ancient and modern, as I could procure, that the acquisition of property obtained by the state at the revolution was not an escheat, as defined by any elementary writers on the laws of England—none of these have omitted it, and all of them correspond with the definition given by Blackstone, vol. 2, p. 244. I shall therefore only cite that respectable authority in his own words;—Escheat, we may remember, was one " of the fruits and consequences of seudal tenure; " the word itself is originally French or Norman, " in which language it signifies chance or acci-" dent, and with us denotes an obstruction of the " course of descent, and a consequent determi-" nation of the tenure by some unforeseen con-" tingency, in which case the estate naturally re-" sults back, by a kind of reversion, to the ori-" ginal grantor, or lord of the fee," Every person knows in what manner the citizens acquired the property of the soil within the limits of this state. Being dissatisfied with the measures of the British government, they revolted from it, assumed the government into their own hands, seized and took possession of all the estates of the King of Great-Britain and his subjects, appropriated them to their own use, and defended their possessions against the claims of Great-Britain, during a long and bloody war, and finally obtained a relinquishment of those claims by the treaty of Paris. But this state had no title to *263 the territory prior to the title of the King of Great-Britain and his subjects, nor did it ever claim as lord paramount to them. This state was not the original grantor to them, nor did they ever hold by any kind of tenure under the state, or owe it any allegiance or other duties to which an escheat is annexed. How then can it be said, that the lands in, this case naturally results back by a kind of reversion to this state, to a source from whence it never issued, and from tenants who never held under it? Might it not be stated with equal propriety, that this country escheated to the King of Great-Britain from the aborigines, when he drove them off, and took and maintained possession of their country ?
At the time of the revolution, and before the declaration of independence, the collective body of the people had neither right to, nor possession of the territory of this state—it is true, some individuals had a right to, and were in possession of certain portions of it, which they held under grants from the King of Great-Britain; but they did not hold, nor did any of his subjects hold, under the collective body of the people, who had no power to grant any part of it. After the declaration of independence, and the establishment of the Constitution, the people may be said first to have taken possession of this country, at least so much of it as was not previously appropriated to individuals. Then their sovereignty commenced, and with it a light to all the property not previously vested in individual citizens, with all the other rights of sovereignty, and amongst those the right of escheats. This sovereignty did not accrue to them by escheat, but by conquest, from the King of Great Britain and his subjects; *264 but they acquired nothing by that means from the citizens of the state—each individual had, under this view of the case, a right to retain his private property, independent of the reservation in the declaration of rights : but if there could be any doubt on that head, it is clearly explained and obviated by the proviso in that instrument. Therefore whether the state took by right of conquest or escheat, all the interest which the U. F. had previous to the declaration of independence, still remained with them, on every principle of law and equity, because they are purchasers for a valuable consideration, and being in possession as Ces lui que trust, under the statute for transferring uses into possession ; and citizens of this state, at the time of the declaration of independence, and at the time of making the declaration of rights, their interest is secured to them beyond the reach of any act of Assembly ; neither can it be affected by any principle arising front the doctrine of escheats, supposing, what I do not admit, that the state took by escheat.
On consideration of this case, I am of opinion that the bill is insufficient for want of proper parties, as set forth in the demurrer, and ought to be dismissed, unless the court permit the parties to amend, by adding the proper parties—That the other causes of demurrer are not material, and ought to be over-ruled.
On the motion of the complainant to amend, I am of opinion, that as there has not yet been any judgment on the demurrer, that on application to the court of Morgan district, they be permitted to amend, by inferring proper parties in their bill, on paying the costs of the bill and de *265 murrer, and one attorney’s fee.—See Milford on Pleading, E. III. 146—174.
Taylor, Judge.—
The argument of this cause has been conducted in a manner which reflects much honour upon the candour and liberality of the counsel concerned, while it attests, in an equal degree, their learning and diligent research. The general principles involved in this case, are unquestionably of the first importance, derived not merely from the value of the subject in dispute, which however is very considerable, but principally from the influence a decision of them must necessarily have, in ascertaining the law of the state, upon points hitherto undecided. It is on this account that my opinion, on some of the questions, will be given with diffidence: but whatever misapprehensions I may entertain, consolation is derived from the hope, that my errors will, at least, be rendered harmless, by the judgment of my brethren.
Two questions arise out of the demurrer; one as to the complainant’s right, the other as to the sufficiency of the mode in which he has thought proper to prosecute it. For the sake of perspicuity, therefore, it will be proper to state distinctly the charges in the bill, under these respective heads.
1st. In relation to the plaintiff’s right.—On the 12th of November, 1754, Henry Cossart, as trustee for the U. F. obtained from the late Earl Granville, two grants for tracts of land in Wilkes county, upon a representation being made to him that a considerable portion of the Wachovia district, a former purchase on the same *266 account, was barren and unproductive, although it had been paid for as arable land. Before the declaration of independence Henry Cossart died, leaving Christian Frederick Cossart, of Antrim, in Ireland, his heir at law, who became seized, as the law requires.
Christian F. Cossart, being a subject of the King of Great-Britain, and resident in his dominions when the independence of the United States was declared, is supposed to have become an alien to this state, whereby the lands are vested in the state, or by virtue of the confiscation laws subsequently passed.
On the 3d of November, 1772, Christian F. Cossart, in order that the said lands might be sold for the benefit of the U. F. constituted F. W. Marshall, the complainant, his attorney for that purpose, giving him authority to appoint one or more attornies under him, with like powers. On the 4th of October, 1774, Marshall appointed John Michael Graft attorney for the same object, and with the same power.
On the 23d of July, 1778, Graff, in pursuance of his authority, sold the lands to Hugh Montgomery, who paid part of the purchase money, and received a conveyance duly executed ; and in order to secure the residue, mortgaged the land to Graff, in trust for the U. F. Graff soon after died, and Trauggott Bagge, his administrator, on the 30th Dec. 1784, assigned the term to F. W. Marshall, then and now the agent of the Unitas Fratrum.
*267 In July, 1778, Montgomery took possession of the land, and continued during his life-time, as his trustees have done since his death, in possession of part of the same.
In December, 1779, Montgomery conveyed the lands to trustees, of whom John Brown is the survivor, in trust, for two infant children, and until their arrival at full age. At the same time Montgomery also made his last will, whereby he charged the rest of his real and personal estate, with the payment of his just debts, and particularly the debt due to the Moravians.
The bill then charges a number of persons by name with having taken possession of the lands, pretending to derive a title under William Lenoir, who has obtained grants for the same, under the pretended authority of the land law passed in 1777, claiming the land discharged from the trust.
By an act of Assembly passed in 1782, it is enacted, that the power of attorney of Christian F. Cossart, dated the 3d April, 1772 empowering the said Marshall to sell his lands, be admitted to probate and registry in the county of Wilkes, and be as good and valid in law, as it could or might have been, had the act of confiscation never passed.
2d. In relation to the remedy.—That the U. F. has been acknowledged as an ancient Episcopal Protestant Church, by the Parliament of G. B. and the Bishops of the Church of England, by a public act of Parliament of the year 1749. As such it hath sublisted in this state about 40 years, and the title and stile of the said act of *268 Parliament, has been acknowledged and ratified by acts of the General Assembly of this state, as well as in various legal proceedings since.
The church has neither joint stock, funds nor revenue, yet at sundry times the active members amongst them, such as the lord advocate, the chancellor and agent, have caused loans for general concerns to be made amongst their friends, and able members, particularly for new settlements, as was done in the purchase of the Wachovia district. For these objects great capitals have been raised, upon condition that the creditors should receive land in payment if they came to this state, or out of the sale thereof by him who has the fee.
F. W. Marshall, the complainant, is at present seized in fee of the lands which he is authorized to sell, and in general to conduct and manage their concerns. He is likewise authorized to institute suits in law or equity, concerning the matters complained of in the bill; and the U. F. are bound and concluded by all such judgments and decrees as may be rendered in any court of this state, in which suits may be brought.
Besides the general prayer, the bill seeks a disclosure of the defendants title, a conveyance of the legal estate, if they have any, to Montgomery’s trustees, or a surrender of the possession for the benefit of the heirs.
If the title which Christian F. Cossart had in these lands was divested out of him, and vested in the state, it must have been either by confis *269 cation, forfeiture by reason of alienage, or escheat for want of a legal proprietor.
If by either of these means it shall appear that the legal title has devolved upon the state, it will then be necessary to enquire whether it is subject to the trust or equitable claim, which accompanied it in the hands of Cossart?
1st. The act passed in 1782, appears to me to have precluded the necessity of investigating the question, whether the confiscation laws attached upon the lands as the property of Cossart; for on the supposition that they did so attach, the terms of the act, though not strictly appropriate, are yet sufficiently expressive of the will of the makers, that as to this property confiscation shall not operate.
Its avowed object is to quiet the minds of those persons to whom conveyances had been, or were to be made of any part of the lands transferred to Cossart in trust for the U. F.—To this end, the purview explicitly declares, that the power of attorney from Cossart to Marshall shall be as good and valid in law, as it could or might have been, had the act of confiscation never been passed.—The manifest design of the power of attorney, was to enable Marshall to perform those acts for the benefit of the society, which Cossart, being absent beyond sea, could not, on that account, conveniently execute himself. If the act had merely admitted the power to probate, the questions of Cossart’s right, and the consequent goodness of the sales, might have been still left open to future discussion. But it does not rest there; it gives validity to the power, and does *270 therefore virtually and in effect confirm and validate the sales which had been made, or which might thereafter take place under it, so far at least as they required protection against the confiscation acts.
Thus far it seems necessary to proceed, for the sake of giving to the act a construction which is absolutely necessary to effectuate the intention of the legislature, and one without which it is deprived of all sensible effect or useful energy; a construction, too, which is warranted by the maxim, " Quando lex aliquid concedit, concedere videtur et id per quod devenitur ad illud.” A person whose title has been divested out of him by confiscation, cannot sell, neither can he authorize another to sell for him; yet if an act of Assembly gives validity to a power of attorney made by him, the sale taking place under it is necessarily confirmed. Nor can it be doubted that the same consequence will follow, if an act of Assembly restore validity to a power of attorney made by a person having good title at the time, though it becomes defective by subsequent causes. The latter is supposed to have been the situation of Cossart, when the act was passed.
The only defect of tide in Cossart, that seems to have been contemplated by the drawer of the act, is the one arising from confiscation; all others, from whatever cause, are omitted. It is probable that his title was not believed to be exposed to any other objections, and if it had been, that they also would have been provided against. I infer this, from the apparent futility of passing an act for the purpose of redeeming a title from defects of one kind, when it is equally vulnerable *271 in other parts. Forfeiture by reason of alienage and escheat, are neither brought into view, nor is their possible operation guarded against; and I think that the court cannot, upon just principles of construction extend the act, so as to remove the defects which may arise from these sources. Were the words used in the act obscure or doubtful, then the intention of the legislature must have been resorted to, in order to find the meaning: but here is no obscurity; the words are plain, their signification is obvious. Had expressions of general and comprehensive import been made use of, then the other supposed defects might have been considered within the equity of the act : but as they have specified confiscation alone, it cannot safely be asserted that they meant to comprehend the other cases of forfeiture and escheat. A construction of this kind would seem to infringe the rule, that private statutes ought to be construed strictly—2 Mod. 57.—Whereas the construction that wrests the sales from the imperfection cast on them by the confiscation laws, is the genuine and necessary interpretation of the letter. It is also recommended by its perfect conformity to the principles of an enlarged and liberal justice. In this case, as in many others that appear in the private acts, the legislature subscribed to the propriety of relinquishing claims under the confiscation acts, which, if vigorously insisted on, might have deprived one man of his property, for the absence or delinquency of another. They have accordingly, in several instances, abstained from appropriating to the public use, lands whereon persons having a right in confidence were disposed to settle; and in virtue of their ownership, to render to the state the fidelity of good citizens. The law in *272 question seems to offer a merited tribute of justice to a society of men, who in the midst of many difficulties, established the workshops of industry, and diffused the habits of moral orders where, but a short time before, the silence of uncultivated nature reigned through the forest.
I will conclude this part of the case by remarking, that the legislature had an undoubted right to renounce claims which the public, whom they represent, might derive under the various acts of confiscation. The rights of third persons, though not expressly saved, are understood in all such cases to be guarded by equity—8 Co. 138.—Such rights, however, do not appear in any of these proceedings, and therefore the act is not impeachable on that ground. The unavoidable consequence is, that the title of these lands was either in Montgomery’s trustees or in the state : if the latter acquired it by confiscation, then the act of Assembly amounts to an abandonment of such right.
2d. Before the year 1776, it cannot be doubted that Christian F. Cossart, being, together with the inhabitants of this state, common subjects of the same sovereign, was capable of taking by descent lands situate in the then province, and of holding them. Before that period also, the descent was cast, and Cossart was, in the full legal sense of the term, tenant in fee simple, and as such liable to execute the trusts with which the title was incumbered. But the argument is, that by the severance of these states from the British empire, he became an alien, and thenceforward incapable of holding any real estate within this territory; a *273 nd that the consequence of his alienage, was a forfeiture of his lands to the state.
The cases upon this subject to be found in the books, do not furnish a ground of strict analogy, nor even sufficient data wherefrom direct inferences can be drawn applicable to the new and peculiar modifications proceeding from our revolution. By the term alien, the writers mean a person born out of the King’s allegiance. No instance is to be found, where lands once lawfully acquired, have become forfeited on the ground of posterior alienage: the possibility of such a case seems to be excluded by the doctrine in Calvin’s case, Co. Rep. and a fundamental maxim of the common law, “ nemo potest exuere patriam." Some of their late writers have, however, considered the inhabitants of the United States as aliens, from the recognition of their independence : and it is possible they might be considered in the same light by the law of that country, in all the consequences of that character. Whether they have subjected lands owned in that county by the citizens of this, to the principle of alienage, I am not informed. I am inclined to believe they have not, in any instance; because the late treaty with that nation recognizes in one of its articles, the holding of lands in that country by the citizens of this, and so vice versa.
It may however be thought that some of the reasons upon which the common law found the incapacity of an alien to hold lands, apply, with, undiminished strength, to attach alien disability to those who became aliens by the revolution. In both cases it would be equally impolitic to permit the permanent property in the soil to be *274 held by those who owe no constant allegiance to the government, left the influence thus generated might be directed against the policy and welfare of the country. But if the opinion be correct, (which is advanced by a writer of reputation, 2 Bl. though denied in Parker, 144) that the forfeiture which ensues the purchase by an alien, is intended by way of punishment for his presumption in attempting to acquire any landed property; such a reason totally fails in its application to cases circumstanced like the present: For punishment cannot with justice be inflicted, where neither crime has been committed, nor presumption manifested.
In the acquisition of his title, Cossart was passive—it was cast upon him by the operation of law, which would have continued to extend its silent protection to it, but for an event which was beyond the reach of individual agency. Had he even been an inhabitant of the state before the commencement of the revolution, and dissatisfied with the prospect of the new political arrangement about to open, writers on the law of nations say that a person so situated, may dispose of his effects, and remove wheresoever he pleases. This principle is likewise recognized in the confiscation laws of this state. If the doctrine rested upon this ground alone; if aliens were to be deprived of property purchased by them, only by way of punishment for having attempted to become proprietors, then it is clear that such a consequence ought not to be extended to persons who take property before the separation of the United States from Great-Britain. But with whatever reasons of policy or justice confiscation may have been extended to those who abandoned their country in the hour *275 of danger, and neglected to avail themselves of the privilege of selling; or to those who, after having pledged their allegiance to the new government, united their hostile exertions with the enemy no blame can, with propriety, be imputed to the persons who thought proper to remain in their own country. If forfeiture of the lands of such persons, arising from, their incapacity to hold, be the consequence of the revolution, it must then be rested upon the single ground of public policy, from which I do not apprehend that any principle arises which warrants the application of more rigorous or summary justice to divest their titles, than might have been called forth had they purchased, being aliens. I cannot discern any reason why the law of forfeiture on account of alienage, if it is applied to these persons, should not be accompanied with the same restrictions, which belong to it in the case of an alien purchasing before or since the revolution. The one may purchase but cannot hold; the other was at the time competent both to purchase and hold, but his capacity for the latter is supposed to be destroyed by supervenient causes. An alien, according to the common law defin ition, does by purchase acquire the freehold, and become tenant to the lord of whom the lands are holden—And until office found, he is recognized as a tenant for many purposes: therefore survivorship shall take place between an alien and a subject, who purchase in jointenancy, which continues until it is severed by the office; because the freehold being in the alien by livery, shall, only be divested by the solemn of an office—Dyer 283.—On a covenant to stand seized, an use will arise for an alien—Godb. 275 —An alien tenant in tail may suffer a recovery and dock the *276 remainders—Goldbor. 102.—Although common recoveries are deemed to some intents fictitious, yet the writ of entry must be brought against one that is actually seized of the freehold by right or by wrong—Pigot 28.—Therefore unless an alien was considered as seized of the freehold, he could not be a good tenant to the præcipe. It is also generally true, that wherever an alien takes by his own act, the freehold is considered as in him, until an office, although he is not permitted to take by an act of law, even for the benefit of the King.
From these authorities and this reasoning, I think these conclusions are deducible : That in the application of the law of forfeiture to Christian F. Cossart, he ought to be considered in the light of an alien purchasing lands in this province or state, either before or since the revolution—that in the one case, the lands would not have been divested out of him, and vested in the lords proprietors ; nor in the other in the state, without an office—That this solemnity not having been performed, no title of forfeiture has accrued to the state.
3d. Escheat for want of a legal proprietor.—The general acceptation of the term escheat, according to the common law, supposes that the person last seized has died without heirs, or that his blood is attainted. In the one case, the writ of escheat must shew the death of the tenant—10 Viner 155.—In the other, there must be judgment of death given in some court of record against the felon found guilty, by verdict or confession of the felony ; or it must be by outlawry of him—Bac. Use of the Law, 38.—It denotes *277 an obstruction of the course of descent, and a consequent determination of the tenure, by some unforeseen contingency, in which case the land naturally results back by a kind of reversion to the original grantor or lord of the soil—2 Bl. 244.—According to another writer, it imports something happening or returning to the lord on a determination of the tenure only—Wright on Ten. 117.—The word originally signifies any thing coming accidentally or by chance, and in such sense comprehending casual obventions and forfeitures of all kinds. In the general and comprehensive sense of lands left without any lawful proprietor, from whatever cause, it is probable that the legislature used the term, when, in 1789, they vested all escheats in the University. But the questions whether the lands of Christian F. Cossart were comprised under this general denomination? Whether they were left without any lawful proprietor, and devolved upon the state as an escheat? I conceive it unnecessary for me to give an opinion upon, because there are other grounds upon which I can decide this case, in a manner satisfactory to my own mind; and without necessity I should feel reluctant in giving an opinion upon a point, respecting which the greatest lawyers have disagreed, and which may probably be the only question in some future case. Its importance entitles it to a separate and solemn argument, and deliberate investigation; and it might be unsafe to decide it, but under all the light which these may reflect upon it.
4th. It is contended that the state has taken this land discharged of the trust, in analogy to the prerogative of the King, who is incapable of being a trustee; and to the lord by escheat, who, *278 coming in by title paramount, and in the post, takes the land free from any collateral charges, wherewith the tenant has incumbered it. To maintain these positions, and the consequences drawn from them, a great variety of authorities has been introduced ; but I cannot, after a careful perusal, collect from them that the law is so settled at this day. Assuredly the doctrine is not reconcilable with the broad and liberal principles adopted by this court, in the consideration of trust estates ; nor with the reason and policy of making the statute of uses.
As trusts are said to be the mere creatures of a court of equity, into which they were drawn on account of some scruples which the common law judges could not surmount, a system has been steadily persevered in with respect to them, most likely to effectuate their intent; and at the same time to avoid those inconveniences which had rendered uses odious. It could not therefore be just to suffer them to fail, and the right intentions of the parties to be undermined, by reason of any disability in the trustee. In this court he is properly considered as the mere instrument of conveyance, and can extinguish the right of Ces lui que trust only in a single instance, that of conveying to a purchaser without notice of the trust, and for a valuable consideration. In conformity with this equitable notion, the decisions have been extended to a great and beneficial length. Where a trustee has been incapable through some legal disability to convey or execute an estate, the court of chancery has removed him out of the trust—2 Chan. Ca. 130.
*279 Wherever there is a defective or improper trustee, chancery acts as if there were none—1 Brown Cha. Ca. 81.—And in every instance the court is solicitous to carry into effect the intention of the person who is really the owner of the land, and to attach the trust to the land itself, rather than make it dependent on the personal competency of the trustee. The source of all complaints again it uses, as they prevailed previous to the statute of H. VIII. was, that the feoffees were considered as the true owners; and the mischiefs which flowed from them, under the influence of this opinion, would result an equal degree from trusts, were the estate of the trustee held in greater estimation than that of the Ces lui que trust. That statute divested the possession out of the person seized to the use, and transferred it to the Ces lui que use, with a view of annulling those inconveniences which were occasioned by considering the feoffee as the real owner; which character subjected him to the performance of the feudal duties, gave dower to his wife, placed his infant heir m wardship to the lord, and forfeited the estate upon his attainder.
The principle upon which the doctrine in Chudleigh’s case is founded, is, that persons coming in by a paramount and extraneous title, are not seized to an use, as the diffeisor, abator or intruder of the feoffee, or the tenant in dower, or by the courtesey of a feoffee, or the lord entering upon the possession by escheat; none of these claiming under the feoffee, but being, as the law expresses it, in the post. When that case was decided, trusts had not undergone much discussion; their principles were but partially developed ; and the foundation only of that system *280 laid, by which they have been since made to answer the beneficial ends of uses, without their inconveniences. In justice and reason, the title of persons so claiming was no better than that of the heir or alienee. Every volunteer claimant, and every claimant with notice, whether they come in the per or in the post, ought to be bound to the performance of the trusts. And in relation to this point, the sentiments of Lord Mansfield are applicable : “ I apprehend the old law of uses “ does not conclude trusts now; where the prac-“ tice is founded on the same reasons and grounds, “ the practice is now followed. Its positive au-“ thority does not bind where the reason is de-“ fective; more especially that part of the old “ law of uses which did not allow any relief to “ be given for or against estates in the post, does “ not now bind by its authority in the case of “ trusts.”—1 Bl. 1155.
The decisions, so far as the point has been decided, justify these sentiments. If a trustee commits felony, though the lands are forfeited at law, yet Ces lui que trust may have relief in equity; so if he commits treasons—3 Com. 386. —The trustee of a legacy dying before the legacy is paid, shall not prejudice the legatee; so if a trustee of land dies without heir, though the lord by escheat will have the land at law, yet it will be subject to the trust in equity.—Prec. Ch. 202.
If A put out money at interest in the name of B, who afterwards becomes felo de fe, A may be relieved against the King, upon the statute 33 Hen. VIII—1 Eq. Ca. Abr. 384 —The general principle which prevails in a court of equity, is to consider the trustee as having the legal own *281 ership so far only as to be beneficial to Ces lui que trust, and not subject to any advantage or disadvantage which may arise from the trustee personally, as having the legal estate. These authorities derive countenance and support from Gilbert on Eq. 172—1 Brown. Cha. Ca. 204.
Nothing can be fairly collected from the case of Burgess vs. Wheate, 1 Bl. 123, or from Fonblauque’s note to Gilbert’s Treatise, to impeach the foundness of the doctrine. In the former it was only decided against the opinion of Lord Mansfield, that the crown could not in equity, upon a failure of the heirs of Ces lui que trust, claim against a trustee by escheat, if he had the legal estate in him, upon the principle that the title by escheat could only arise where there was a defect of a tenant; but that the ground of escheat failed, whenever there was a tenant, whether he were beneficially interested or not. The court did not decide, nor did the case present the question, whether a lord by escheat was discharged of the trust, as against the Ces lui que trust: but the opinion of the majority of the court was, that if an estate, liable to a trust, come to the King, the land will in equity be equally bound by the trust in the hands of the King, as of a common person.
If, then, the persons beneficially interested in this case possessed a right against the state, notwithstanding the escheat from their trustee, the cause between the present parties ought to be decided without prejudice, from the consideration that the plaintiffs can have no remedy from the state. For whether such a remedy against the state existed or not, which could only properly *282 be tried where the state was a party, I should think that this court might furnish them with an adequate remedy against persons claiming under the state with notice of the trust, which is the character given by the bill to these defendants. The doctrine of prerogative, if introduced here to govern questions relative to the rights of the state, should not be extended further than just analogy and a temperate application of its principles will warrant. It should be made subservient to the purposes of justice, while it protects the immunities of the state; and such of its consequences as promote these objects, should be adopted with the doctrine itself. Now, though a suit will not lie against the King, yet his prerogatives are not transferred with the property to his grantee. Thus his patentee shall not take advantage of the maxim, nullum tempus occurrit regi—Poph. 26.—If the King grant lands which he has seized without title or matter of record, the person having right may enter upon the grantee without petition—Skin. 608.—If the King enters without title, or seizes land by a void or insufficient office, he is no disseisor; but if by letters patent he grants the lands so seized, and the patentee enters, he is a disseisor; because he has time to enquire into the legality of his title, which the King is supposed to want leisure for— 5 Bac. 607.—In all cases where the party “ grieved may have a monstrans de droit, or “ travers against the King, there if the King “ granteth over the land, the party grieved may “ enter, or have his action against the patentee—4 Rep. 212.—Viewing these authorities as creating a difference between the crown and its grantee, and so authorizing a full legal remedy against the latter, where only the partial remedy *283 of petition or plea of right was allowed against the former; and considering that there are cases, where our legislature has sanctioned bills in equity for injunctions against the state, I am led to the conclusion, that the present defendants are not privileged from answering by reason of deriving their title from the state.
The objections to the form of the present bill have been relied upon the following grounds of argument: That all persons materially interested in a suit in equity, ought to be made parties, plaintiffs or defendants, however numerous they may be, so that a decree complete and final may be made—That the persons who advanced money for the purchase of these lands being entitled to satisfaction, either in lands if they came to this country, or out of the money arising out of the sale of the lands if they did not come, ought to have been parties to the bill; and that the members who compose the U. F. ought to have been named in the bill, and their interest stated—That the creditors who advanced money, together with the sums respectively loaned by them, should likewise have been dated, in order that the court might see the nature and extent of their interest. And it is particularly insisted upon, that although the bill is brought by Marshall, in behalf of himself and the concerns of the U. F. yet it would be unjust to decree for all the members, since they alone are beneficially entitled, by whose assistance the lands were purchased.
To ascertain the due weight of these objections, it will be necessary to enquire who the parties concerned in interest really are, and what are the ends and purposes of the bill?
*284 The U. F. is an association of persons voluntarily submitting to certain regulations, with a view of promoting objects of a religious and social nature. They have neither incorporation, joint stock nor funds; but they prosecute, under the influence of a sentiment common to the whole community, certain ends which they deem necessary to the prosperity of their society. If, in their native country, they possessed not the assurance that the toils of their industry would meet an adequate reward, or that free toleration would be allowed to the exercises of their religion, it was natural to seek a more favoured clime, where new settlements for the accommodation of their members might be formed, under happier auspices. With this view the lands purchased from Lord Granville were obtained, by means of loans procured from their able members, by the lord advocate, chancellor and agent, and active members. The security for the money advanced, consisted in their agents responsibility to convey lands to them if they came over to this country, or to sell lands and reimburse them out of the proceeds, if they did not. So long as the title of the lands purchased by their agent remained in him, the creditors had an option, either to compel him to convey to them in satisfaction of their respective debts, or to sell, and by that means satisfy them. But when he, cloathed with full powers for that purpose, made sale of the lands, the rights of the creditors were necessarily abridged to a simple claim of the money which they had advanced. In the specific lands, which form the subject of the present controversy, it is apparent that the creditors, whoever they are, can have no interest. All they can ask or obtain, is the money due on the sale; and this they *285 can only receive in the event of its appearing that Graff’s sale to Montgomery conveyed a good title. If, on the other hand, Graff had no right to sell, the steps by which that conclusion is arrived at, lead also to this other, that the complainant has no right to the land. The bill accordingly seeks a decree that the defendants may convey the legal title, if they have any, to the trustee of Montgomery, or that they may deliver possession of the land to the trustee, for the use and benefit of the infants; and that the executor of Montgomery may pay the complainant in trust for the U. F. the principal and interest due upon the purchase. Should the claims of the complainant be established by a decree, his character will be that of a trustee for so much money as is recovered for those creditors who made advances for the Wachovia purchase. It is then to be examined, whether the principles of equity require, or the authorities cited prove, that all the persons who lent money ought to have been parties to the bill.
It is expedient for several reasons, that all persons concerned in a demand should be called before the court. If it appears upon the face of the bill, that there are other parties whose rights may be affected by a decree, it would be vain and useless to go on to a decision of the cause : For a decree made under such circumstances, is liable to reversal, or at least none but the real parties, and those claiming under them, are affected by it, and the persons who are left out may vex the defendants with another suit. Wherever any of these inconveniences may follow, from the omission of parties, the general rule ought to be *286 observed, and all the parties interested, however, numerous they may be, should be brought in.
Unless this case, under all its circumstances, comes within some of the exceptions to the rule, the demurrer on this ground must prevail. It will be proper, in order to ascertain this question, to examine in the first place the cases cited, by which the rule itself is illustrated. The case of Leigh vs. Thomas, 2 Vesey, 312, the substance of which is, that a bill was brought for an account of prize-money, and to have two shares paid to two plaintiffs, as agents, which they claimed under the general articles on which the cruise was set on foot. In them there was no appropriation of shares to persons afterwards appointed agents, but a general provision that the crew should have liberty to appoint two agents. The plaintiffs were appointed agents by a subsequent deed, signed by sixty-four out of eighty, the number of the whole crew; and they brought this bill in behalf of themselves and of the said sixty-four. Upon a demurrer for not making the whole crew parties, the master of the rolls was of opinion that the whole crew ought to have been made parties, because the subsequent agreement could not be binding on them; and that they had a right to litigate the claim set up by the plaintiffs of two shares on their own account. This decision is clearly justified by the reasons on which the rule is founded. No decree made in the case could have been binding on the absent part of the crew, who had given no authority for the suit, and whose rights were improperly attempted to be drawn into controversy without their consent.
*287 The case of Kirk vs. Clark & others, Finch's Prec. 275, was where a bill was brought by a trustee to compel the specific performance of marriage articles, and the Ces lui que trust was not made a party; and therefore it was prayed that the cause might not go on, after opening the bill and answer, because if the bill should be dismissed, the Ces lui que trust would not at all be bound by it; and so the defendants liable to another suit for the same cause—and the Ces lui que trust was directed to be made a party. It was observed in that case, that bills had been sometimes allowed which were brought by a Ces lui que trust, without making the trustee a party; yet that was upon the Ces lui que trust’s undertaking for the trustee that he should conform to what decree should be made, which might be reasonable, he having no interest at all, in his own right; but a trustee could not so undertake for his Ces lui que trust.
The principle and policy of the rule are again manifest in this case ; The rights of the person substantially interested, shall not be litigated without making him a party, nor shall the suit be tried in the absence of a party nominally concerned, if by possibility he may renew the contest. The Ces lui que trust may undertake that the trustee shall conform to the decree, because the former is really the true party; but a trustee cannot so bind the Ces lui que trust. If the Ces lui que trust, instituting a suit in his own name, may proceed to a decree upon his undertaking that the trustee shall conform to it, by the same reason may the latter prosecute a suit where the Ces lui que trust undertakes for himself. It can be of no importance by whom the suit is brought *288 if the party not before the court is bound, either by himself, if the Ces lui que trust, or by the Ces lui que trust, if the trustee, not to disturb the decree which shall be made. This reasoning is of force in the present case, when connected with the statement in the bill, that the complainant is authorized to institute suits in law or equity, concerning the matters complained of, and that the U. F. are bound and concluded by all such judgments and decrees as may be rendered, &c.
The case in Banbury 53, and that of Hanne vs. Stevens, 1 Vernon 110, do farther establish the general doctrine, and the reasoning in the latter case demonstrates its propriety, that a defendant, as a trustee for three persons, is not bound to answer a bill brought by one of the Ces lui que trusts; for otherwise he might be thrice called to an account for the same matter.
But the circumstance of the complainant being authorized to bring suits for the others concerned in interest, and of the present suit being brought to recover the money for which the land fold, seem to bring the present case completely within the principle of those wherein it has been held that creditors seeking an account of real and personal estate for payment of their demands, a few suing on behalf of the rest, may substantiate the suit. The following case is very applicable, both in authority and the reasons on which it is founded—Finch 592, Chancey vs. May.—This was a bill brought by the present treasurer and manager of the Temple Mills Brass Work, in behalf of themselves and all other proprietors and partners in the first undertaking, except the defendants, who were the late treasurer and managers, *289 being about thirteen in number, and was to call them to an account for several misapplications, mismanagements and embezzlements of the copartnership, in the late South Sea times, to a great amount. The copartnership consisted originally but of eighteen shares, but those eighteen shares, in the year 1720, were split and divided into five hundred. The defendant demurred for, that all the rest of the propreitors were not made parties, and so every one had the same right to call them to an account, and then they might be harrassed and perplexed with multiplicity of suits. But the demurrer was disallowed: 1st. Because it was in behalf of themselves and of all others the proprietors of the said undertaking, except the defendants, and so all the rest were in effect parties—2d. Because it would be impracticable to make them all parties by name, and there would be continual abatements by death and otherwise, and no coming at justice if all were to be made parties.
With equal propriety it may be said in the present case, that, the suit being brought by Marshall, in behalf of himself and the concerns of the U. F. all the persons who have an interest in the money advanced, are virtually and in effect parties, and if continual abatements would not be the necessary effect of inserting the whole, at least endless delays might be expected as the natural consequence.
It is needless to multiply authorities upon this part of the case, for in every view of it presented to my mind, the suit is properly instituted by Marshall, in behalf of himself and the others concerned. From this mode I cannot foresee that *290 any inconvenience will arise, any deterioration of the rights of others, or any needless and unjust vexation to the defendants; for a decree, in the present form of the bill, will for ever preclude the persons who are interested, by having advanced the money to effect the purchases, from suing the party defendants, on the grounds made by the present bill.
If by the judgment of the court, the demurrer should be over-ruled, and the defendants required to answer—if the complainant’s power to prosecute suits for the U. F. and his capacity to bind them by a judgment, should then be doubted, the court before whom the cause is tried may, and no doubt will, require such proofs of his asserted authority as will cloath their decree with conclusive effect.
Upon the whole of this case, the general conclusions of my opinion are, 1st. That the private act passed in 1782, did effectually and completely clear Cossart's title to the lands which he held as trustee for the U. F. from all defects and imperfections, to which any of the confiscation acts passed by the legislature of this state might, before that time, have subjected it.
2d. That the state gained no title by forfeiture on account of alienage, for want of an office, or something equivalent; even if the principles of the common law warrant the extension of this doctrine, to persons who lawfully held lands in this state prior to the revolution, and who have not since become citizens of this state, or any of the United States—a proposition which I am not *291 at present prepared to admit, in the extent inlisted on.
3d. Waving any positive opinion upon the question whether the lands escheated to the state, under the comprehensive nation of the term, which calls upon the sovereignty of the country all titles to lands, which would otherwise be destitute of a lawful proprietor, I am decidedly of opinion, that even such a legal title would be subjected to the equitable right of the Ces lui que trust, and is, in the hands of persons claiming under the state, subject to the equitable remedy of the Ces lui que trust.
4th. That the manner in which the complainant’s bill is framed, with respect to parties, is warranted by reason, and sanctioned by authority, consequently that the demurrer ought to be disallowed.